# IN THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

---

No. 24-13463-C

---

*Plaintiff-Appellee Grange Insurance Company*

v.

*Defendant-Appellants Mark Martin, Shannon Martin, and Classic City Clydesdales, LLC*

---

On Appeal from
the United State District Court
for the Middle District of Georgia
Case No. 3:23-cv-00145-TES

---

## OPENING BRIEF OF DEFENDANT-APPELLANTS

---

Jonathan Palmer
Georgia Bar No. 453452
**KNIGHT PALMER, LLC**
One Midtown Plaza
1360 Peachtree St., N.E.
Suite 1201
Atlanta, GA 30309
Tel: 404-228-4822
*Counsel for Defendant-Appellants*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

COME NOW, Defendant-Appellants Mark Martin, Shannon Martin, and Classic City Clydesdales, LLC (collectively, the "Appellants"), and hereby submit their Certificate of Interested Persons and Corporate Disclosure Statement pursuant to Federal Rules of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1. The following is a complete list of all trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of the particular case or appeal, including subsidiaries, conglomerates, affiliates, parent corporations, any publicly held corporation that owns 10% or more of the party's stock, and other identifiable legal entities related to a party:

1. Aniekwu, Bobby

2. Bedinger, Frank

3. Bobby C. Aniekwu & Associates, LLC

4. Classic City Clydesdales, LLC

5. Grange Holdings, Inc.

6. Grange Indemnity Insurance Company

7. Grange Insurance Company

8. Grange Insurance Company of Michigan

9. Grange Mutual Holding Company

10. Grange Property & Casualty Insurance Company

i

11. Harris, Maria O.

12. Hawkins Parnell & Young, LLP

13. Knight Palmer, LLC

14. Martin, Mark

15. Martin, Shannon

16. Palmer, Jonathan

17. Sears, Nicholas

18. Self, The Honorable Tilman E.

19. Trustgard Insurance Company

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Pursuant to Eleventh Circuit Rule 28-1(c), Appellants state that they do not desire oral argument on this appeal.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ................................................. i

STATEMENT REGARDING ORAL ARGUMENT ........................................ iii

STATEMENT REGARDING ADOPTION OF BRIEFS ............................... ix

STATEMENT OF SUBJECT-MATTER ........................................................ x

STATEMENT OF THE ISSUES ..........................................................................1

STATEMENT OF THE CASE ..............................................................................2

    A.  The Insurance Policy ............................................................................ 2

    B.  The Underlying Complaint and Related Facts.........................................4

    C.  Appellants' Actions and Notice to Appellee..........................................6

    D. Course of Proceeding and Disposition Below .......................................7

STANDARD OF REVIEW ..................................................................................8

SUMMARY OF THE ARGUMENT....................................................................9

ARGUMENTATION AND CITATION TO AUTHORITY ..................................... 11

    A.  The District Court Erred in Granting Summary Judgment ............................... 11

    B.  The District Court Erred When It Held Appellee Owed Mrs. Martin............. 14

        1.  *Jury Could Conclude Ms. Martin Did Not Have Reasonable Expectation* ............................................................................. 15

        2.  *Ms. Martin Believed that Notice Had Been Provided*........................... 21

3. *Appellants Were Justified in Believing that the Incident was a Worker's Compensation Matter*.................................................................. 23

C. Appellee was Required to Show Prejudice to be Excused of Any Duties...... 25

D. Classic City is Covered by the Policy................................................. 29

CONCLUSION ........................................................................................... 34

## TABLE OF AUTHORITIES

**STATUTES:**

28 U.S.C. § 1332(a)(1) …………………………………………….. vii
28 U.S.C. § 1291 ………………………………………………... vii

**CASES:**

Allstate Ins. Co v. Airport Mini Mall, LLC,

    265 F. Supp. 3d 1356, 1366 (N.D. Ga. 2017) ……………………… 10, 11

Barclay v. Stephenson,

    787 S.E.2d 322 (Ga. Ct. App. 2016)……………………………...… 26

BLB Const. Inc. v. Auto-Owners Ins. Co.,

    418 F. Supp. 3d 1325, 1331 (S.D. Ga. 2019) ……………………..15

Bramley v. Nationwide Affinity Ins. Co. of America

    814 S.E.2d 770 (Ga. Ct. App. 2018) ……………………………… 26, 27

Chapman v. Al Transport.

    229 F.3d 1012, 1023 (11th Cir. 2000) ………………………………... 8

Fid. Nat'l Title Ins. Co. v. Keyingham, Inv., LLC,

    702 S.E.2d 851, 853 (Ga. 2010) ………………………………….. 30

Forshee v. Employer's Mut. Cas. Co.,

    711 S.E.2d 28, 32 (Ga. Ct. App. 2011) ………………………… 16

Gulf Ins. Co. v. Mathis,

    182 Ga. App. 323, 324 (1987) …………………………...……. 29

Hyde v. State Farm Mut. Automobile Ins. Co.,

     848 S.E.2d 145, 147 (Ga. Ct. App. 2020) ………………………… 26

Lankford v. State Farm Mut. Automobile Ins. Co.,

     703 S.E.2d 436 (Ga. Ct. App. 2010) …………………………….. 25,26

Nationwide Mut. Fire Ins. Co. v. Dillard House, Inc.,

     651 F.Supp.2d 1367, 1376 (N.D. Ga. 2009) ………………………….. 11

Nat'l Cas. Co. v. Ga. Sch. Bds. Ass'n-Risk Mgmt. Fund,

     818 S.E.2d 250, 253 (Ga. 2018) ………………………………………... 29

Newberry v. Cotton States Mut. Ins. Co.,

     531 S.E.2d 362, 363-64 (Ga. Ct. App. 2000) ……………………….. 21-23

Penn-Am Insurance Co. v. Disabled Am. Veterans, Inc.,

     224 Ga. App. 557, (1997), aff'd, 268 Ga. 564 (1997) ……………... 10, 11

Plantation Pipe Line Co. v. Stonewall Ins. Co,.,

     780 S.E.2d 501, 510 (Ga. Ct. App. 2015) ………………………….. 24, 27

Progressive Mountain Insurance Co. v. Bishop,

     790 S.E.2d 91 (Ga. Ct. App. 2016) ………………………………… 25, 26

Standard Guar. Ins. Co. v. Carswell,

     384 S.E.2d 213, 215 (Ga. Ct. App. 1989) ……………………………... 22

State Farm Fire & Casualty Co. v. Walnut Ave. Partners,

     675 S.E.2d 534, 538 (Ga. Ct. App. 2009) ……………………………... 15

Vintage Hospitality Group, LLC v. Nat. Trust Ins. Co.,

     565 F. Supp. 3d 1365, 1369 (M.D. Ga. 2021) …………………………. 15

Wilkinson v. Georgia Farm Bureau Mut. Ins. Co.,

     833 S.E.2d 579, 582 (Ga. Ct. App. 2019) ……………………………... 11

## <u>STATEMENT REGARDING ADOPTION OF BRIEFS OF OTHER PARTIES</u>

Pursuant to Eleventh Circuit Rule 28-1(f), Appellants state that they do not adopt by reference any part of a brief of another party.

## <u>STATEMENT OF SUBJECT-MATTER AND APPELLATE JURISDICTION</u>

Jurisdiction is proper in this case under 28 U.S.C. § 1332(a)(1) because this appeal arises from a Final Judgment in a civil diversity action in the United States District Court for the Middle District of Georgia. This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291.

The District Court for the Middle District of Georgia entered a final judgment in this matter on September 25, 2024. Appellants Mark Martin, Shannon Martin, and Classic City Clydesdales, LLC filed a timely Notice of Appeal on October 21, 2024.

x

## STATEMENT OF THE ISSUES

1. Did the District Court error by concluding that Plaintiff-Appellee Grange Insurance Company ("Appellee") had no duty to defend Defendant-Appellants Shannon Martin, Mark Martin and Classic City Clydesdales, LLC (collectively, the "Appellants") in underlying litigation with Maria Harris ("Ms. Harris") by relying on facts outside the underlying operative pleading and the relevant insurance policy?

2. Did the District Court error by concluding that no reasonable jury could conclude that Mrs. Martin had a reasonable excuse for not immediately informing Appellee of her decision to drive Ms. Harris to get medical care?

3. Did the District Court error by concluding that no jury could conclude that Mrs. Martin had a reasonable excuse for not informing Appellee of the events surrounding Ms. Harris' injury because Mrs. Martin believed her husband had already provided notice to Appellee?

4. Did the District Court error by distinguishing the facts of this case from those of *Newberry v. Cotton States Mut. Ins. Co.*, 531 S.E.2d 362, 363-64 (Ga. Ct. App. 2000)?

5. Did the District Court error in concluding that the Appellee need not show prejudice for the late notice because timely notice was a condition precedent?

1

6.     Did the District Court error when concluding that Appellant Classic City Clydesdales, LLC was not insured under the insurance policy?

## STATEMENT OF THE CASE

**A.     The Insurance Policy**

Defendant-Appellee Mark Martin ("Mr. Martin") obtained an insurance policy (the "Policy") from Appellee with Policy No. FO 2770483 02 and with a term from December 15, 2020 to December 15, 2021. [Electronic Court Filing ("ECF") Doc. No. 1-2.] There are two primary Policy provisions at issue: (1) a provision discussing who is an insured; and (2) a notice provision.

As to the first of the two provisions, the Policy originally included language that defined the word "Insured" as:

> . . . you, and if you are:
>
> (1) An individual, "insured" also means the following members of your household:
>    a. Your relatives;
>    b. Any other person under the age of 21 who is in the care of any person specified above.
> (2) A partnership or joint venture, "insured" also means your members and your partners and their spouses, but only with respect to the conduct of your "farming" operations;
> (3) An organization other than a partnership or joint venture, "insured" also means:
>    a. Your executive officers and directors, but only with respect to their duties as your officers and directors; and
>    b. Your stockholders, but only with respect to their liability as stockholders.

2

[ECF Doc. No. 1-2 at p. 35.] This definition is otherwise referred to as "Definition 8" in this Brief. However, Definition 8 was superseded and replaced by an endorsement to the policy, Endorsement GL 04 65 03 07 (the "Endorsement"), which reads in relevant part:

**SECTION II – WHO IS AN INSURED**

1. **If this endorsement is made a part of a policy containing the Farm Liability Coverage Form, Definition 8.** (Section IV) of that Coverage Form does not apply to the insurance afforded under this endorsement.

. . .

3. With respect to the insurance afforded under this endorsement, the following applies:

   a. An individual, you are an insured, and, if they are members of your household, your spouse, and your spouse's relatives who are under the age of 21 are also insureds.

   b. A partnership or joint venture, you are insured. Your members and partners, and their spouses are also insureds, but only with respect to the conduct of your "farming" operations.

   c. **An organization other than a partnership or joint venture, you are an insured. Your executive officers, directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.**

[ECF Doc. No. 1-2 at pp. 7-8 (emphasis added).] This Endorsement led Mr. Martin to believe that the Policy provided insurance coverage both for himself and for Classic City. [ECF Doc. 31-3 at ¶ 2.]

As to the second provision, the Policy also contained a notice provision providing, in relevant part:

**2.   DUTIES IN THE EVENT OF OCCURRENCE, OFFENSE, CLAIM OR SUIT**

b.  You must see to that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

(1) How, when and where the "occurrence" or offense took place;
(2) The names and addresses of any injured persons and witnesses; and
(3) The nature and location of any injury or damage arising out of the "occurrence" or offense.

[ECF Doc. No. 1-2 at p. 33.]

Defendants purchased the Policy at issue through their insurance agent, Johnson Insurance Services, Inc. ("JIS"). [ECF Doc. No. 31-3 at ¶ 2.] Based on his conversations with JIS and his read of the relevant Endorsement, Mr. Martin believed that the Policy covered Classic City as well as himself and Mrs. Martin. [*Id.*]

**B.   The Underlying Complaint and Related Facts**

4

Defendant-Appellants Shannon Martin ("Mrs. Martin") and Classic City Clydesdales, LLC ("Classic City") are defendants in a civil action pending in the Superior Court of Oconee County, Georgia styled *Maria O. Harris v. Classic City Clydesdales, LLC and Shannon Martin*, CAFN: SUCV2023000321 (the "Underlying Lawsuit"). [ECF Doc. No. 1-1.] Ms. Harris filed the complaint in the Underlying Lawsuit on October 10, 2023 (the "Underlying Complaint"). [*Id.*]

Ms. Harris alleges in the Underlying Complaint that Classic City is the owner of a farm/stable that breeds Clydesdale horses. [*Id.* at ¶¶ 7-8.] She contends that Classic City "hired" her to work as a "stable hand." [*Id.* at ¶ 11.] She goes on to allege that, on October 19, 2021, she was working with a "Gator" motorized vehicle and, while doing so, her hand was caught in a winch and two fingers were partially severed (the "Incident"). [*Id.* at ¶¶ 21, 28-31.] She alleges that Mrs. Martin (the wife of Mr. Martin, Classic City's owner) arrived at the scene and drove her directly to St. Mary's hospital. [*Id.* at ¶ 34-40.]

According to the Underlying Complaint, Ms. Harris' fingers were reattached. [*Id.* at ¶ 44.] However, the Underlying Complaint states that her fingertips later began to necrotize, and they had to be amputated. [*Id.* at ¶ 44.] There is no allegation in the Underlying Complaint that Appellants were informed of the subsequent amputation.

5

Ms. Harris filed the Underlying Lawsuit alleging a claim of negligence against both Mrs. Martin and Classic City, but not against Mr. Martin. [*Id.* at ¶¶ 48-62.] The claim of negligence against Mrs. Martin is based on the allegation that Mrs. Martin's actions driving Ms. Harris to St. Mary's Hospital "effectively denied plaintiff Harris the benefit of receiving timely, professional, competent medical care from EMS personnel" that allegedly would have been available in an ambulance. [*Id.* at ¶ 53.] The claims against Classic City are premised on the actions of an individual named Logan, who was working with Ms. Harris at the time and who started the Gator that injured Ms. Harris' fingers. [*Id.* at ¶ 55.] The Underlying Complaint also includes counts of negligence per se (against Classic City only), negligent supervision and training (against Classic City only), negligent and intentional infliction of emotional distress (against both Classic City and Mrs. Martin based on the Incident and amputation), and general and special damages (against Classic City and Mrs. Martin). [*Id.* at ¶¶ 63-98.]

## C.    Appellants' Actions and Notice to Appellee

Immediately following the October 19, 2021 incident, Mr. Martin called JIS and left a message saying, "This is Mark Martin. I am calling about an incident. Please give me a call back." [ECF Doc. No. 31-3 at ¶ 3.] He then told his wife, Mrs. Martin, that he "had called to let their insurance know about the incident." [*Id.* at ¶ 4.] Mrs. Martin interpreted this to mean that he had reported the incident to Appellee.

6

[ECF Doc. No. 31-2 at ¶ 2.] Prior to the filing of the Underlying Complaint, Mrs. Martin was entirely and reasonably unaware that Ms. Harris intended to assert a claim against her for driving her to the hospital instead of waiting on an ambulance to arrive to the remote farm to pick up Ms. Harris. [*Id.* at ¶ 3.] And she reasonably believed, even had Ms. Harris intended to assert such a claim, Appellee had been notified about the potential of any such claim. [*Id.* at ¶ 4.]

Appellants later learned that Ms. Harris had submitted a workers' compensation claim for the injury. [ECF Doc. No. 31-3 at ¶ 5.] Mr. Martin believed that Ms. Harris' injury would be resolved one way or another through the workers' compensation process. [*Id.*] Ms. Harris later withdrew her case from a workers' compensation hearing calendar. [*Id.* at ¶ 6.] Mr. Martin's understanding was that Ms. Harris no longer intended to prosecute her claim. [*Id.*]

## D.    Course of Proceedings and Disposition Below

Appellee filed this action on December 20, 2023. [ECF Doc. No. 1.] Appellee argued that it was entitled to a declaratory judgment on its duty to defend and duty to indemnify because of allegedly late notice of the underlying incident (among other arguments that are not relevant to this appeal). [*Id.* at ¶¶ 16-19.] Appellee argues that the underlying incident occurred on October 19, 2021, but that it did not receive notice until September 6, 2023. [*Id.* at ¶ 17.]

On July 18, 2024, Appellee filed a motion for summary judgment (the "Motion"). [ECF Doc. No. 29.] Appellee sought summary judgment on both its duty to defend and the duty to indemnify under the Policy. [*Id.* at p. 15.] Appellants filed a timely response on August 22, 2024. [ECF Doc. No. 31.]

Appellee argued that notice of the underlying incident was not provided "as soon as practicable" pursuant to the notice provision of the Policy and that no insurance coverage was therefore available. [ECF Doc. No. 29 at pp. 1-2.] According to Appellee, the delay between the October 19, 2021 incident and the notification to it on September 6, 2023 was unreasonable as a matter of law. [ECF Doc. No. 29 at p. 4.]

Appellee further argued that Classic City did not qualify as an "insured" under the Policy because it was not listed in the Policy's declarations page and does not fit the definition of "insured" in the Policy. [*Id.* at p. 2.]

On September 24, 2024, the District Court granted the Motion as to Appellees' duty to defend but denied it as to Appellee's duty to indemnify. [ECF Doc. No. 35 at p. 2.] Appellants filed a timely notice of appeal on October 21, 2024. [ECF Doc. No. 37.]

## STANDARD OF REVIEW

This is an appeal from the grant of a motion for summary judgment. The standard of review for a District Court's grant of summary judgment is *de novo*.

8

*Chapman v. A1 Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000). "[T]he court must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Id.*

## SUMMARY OF THE ARGUMENT

This appeal involves primarily the issue of whether Appellee had a duty to defend Mrs. Martin and Classic City in the Underlying Lawsuit.[1] To evaluate this issue, it is important to understand that this case involves two separate claims: (1) a claim by Ms. Harris against Mrs. Martin and Classic City for Mrs. Martin driving Ms. Harris to get medical attention instead of waiting on an ambulance; and (2) a claim by Ms. Harris against Classic City for allowing the injury to happen in the first place.

Appellees' argument for noncoverage as to Mrs. Martin is that she waited too long to provide notice of the "occurrence" that ultimately gave rise to the claim against her. Appellees' argument for noncoverage as to Classic City is that Classic City waited too long to provide notice of the "occurrence" that ultimately gave rise to the claim against it and that it does not meet the definition of "Insured" under the Policy. All arguments fail for the reasons set forth below.

---

[1] Indirectly, this would apply to whether Appellee had a duty to defend Mr. Martin as well, even though he is not named as a party in the Underlying Lawsuit. He is included in this issue because he is a named Defendant in this action and, conceivably, Ms. Harris could amend her complaint in the Underlying Lawsuit to include him as a defendant as well.

9

A threshold problem exists with Appellee's argument of noncoverage based on late notice: the timing of notice to Appellee does not appear in the Underlying Complaint or the Policy. Under applicable law, when evaluating a duty to defend, Courts are not permitted to peer behind the Policy and operative pleadings to evaluate extraneous facts.

If this Court disagrees with that threshold argument, Appellees' arguments for noncoverage still fail because: (1) Mrs. Martin did not have reason to believe that driving Ms. Harris directly to urgent care for medical attention would result in a claim against her; (2) Mrs. Martin believed that her husband had already provided notice to the insurance company shortly after the incident; (3) Appellants believed that this was potentially a workers' compensation issue and not one that would subject them to lawsuit or liability for which any coverage would be required; and (4) even if the notice was late, Appellee cannot show prejudice.

Classic City shares in arguments (3) and (4) above and can rebut Appellees' contention that it was not covered by the Policy through a simple reading of the Policy's Endorsement. Accordingly, as set forth in more detail below, Appellee has a duty to defend Mrs. Martin and Classic City in the Underlying Lawsuit.[2]

---

[2] Importantly, and as set forth in more detail below, whether Appellees have a duty to indemnify is a separate issue that must wait for resolution of the underlying lawsuit. This is crucial because the duty to defend is much broader than the duty to indemnify and requires a separate standard that is much easier for the Appellants to meet.

## ARGUMENT AND CITATION TO AUTHORITY

**A.  The District Court Erred in Granting Summary Judgment Because It Cannot Consider Allegations Beyond the Policy and Underlying Complaint When Evaluating the Duty to Defend.**

In Georgia and elsewhere, it is axiomatic that the duty to defend is determined solely through a comparison of the Underlying Complaint and the Policy. The District Court acknowledged Appellants' objections to the consideration of any facts extrinsic to the operative complaint and policy, declared that the relevant facts were undisputed (even though some fell outside of the operative complaint and Policy) and then determined that this was a question of law that the District Court could decide. [ECF Doc. No. 35 at p. 20.] The facts considered by the District Court, including the amount of time between the Incident and notice to the Appellee as well as Appellants' justifications for that delay, were improperly considered because there is nothing in the Underlying Complaint or the Policy about how long Appellants waited to report any incident or their excuses for any delay in doing so.

To determine whether Appellee has a duty to defend, the Court "must examine the allegations of the complaint in conjunction with the relevant policy language 'to determine whether a liability covered by the policy is <u>asserted.</u>'" *Allstate Ins. Co. v. Airport Mini Mall, LLC*, 265 F. Supp. 3d 1356, 1366 (N.D. Ga. 2017) (quoting *Penn–Am. Ins. Co. v. Disabled Am. Veterans, Inc.*, 224 Ga. App. 557, (1997), *aff'd*, 268 Ga. 564 (1997)) (emphasis in original).

11

The duty to defend is excused **only** when the underlying complaint "unambiguously excludes coverage under the policy, and thus, the duty to defend exists if the claim *potentially* comes within the policy." *Penn-Am Ins.*, 224 Ga. App. at 565-565 (emphasis added). "Where the claim is one of potential coverage, doubt as to liability and the insurer's duty to defend should be resolved in favor of the insured." *Id.*

"This principle is especially true with respect to exclusions from coverage sought to be invoked by the insurer." *Nationwide Mut. Fire Ins. Co. v. Dillard House, Inc.*, 651 F.Supp.2d 1367, 1376 (N.D. Ga. 2009). Such "exceptions and exclusions to coverage must be narrowly and strictly construed against the insurer and forgivingly construed in favor of the insured to afford coverage." *Wilkinson v. Georgia Farm Bureau Mut. Ins. Co.*, 833 S.E.2d 579, 582 (Ga. Ct. App. 2019).

The District Court ignored this caselaw and proceeded to excuse Appellee's duty to defend, <u>as a matter of law</u>, based on Appellants' delay in notice and its determination that no jury could possibly find that Appellants' explanations for the timing of its notice might excuse any such delay. In doing so, the District Court relied almost exclusively on another district court case, *Allstate Ins. Co. v. Airport Mini Mall, LLC*, 265 F.Supp.3d 1356 (N.D. Ga. 2017). [ECF Doc. No. 35 at pp. 22-24.] While it is true that the district court in *Airport Mini Mall* appears to have examined extraneous information when determining whether there was

12

unreasonable delay in reporting a claim, nothing in the opinion suggests that any party objected to that court looking beyond the underlying complaint and policy to measure an insurer's duty to defend.

Appellants <u>have</u> challenged the consideration of those facts.[3] Obviously, any delay in notice and the explanation for that delay constitute matters outside of the pleadings. While the District Court is entitled to examine a delay in notice when determining whether a duty to indemnify exists, it is limited to the Underlying Complaint and the Policy when determining whether the insurer owes a duty to defend.

The reason for this is clear: Appellants are required to defend the Underlying Lawsuit while simultaneously defending against this action. This action has forced Appellants to reveal their thoughts and opinions about the events that make up the allegations in the Underlying Lawsuit (as well as take certain legal positions) to defend a right to insurance coverage. For instance, one explanation provided by

---

[3] This point is also important because Appellee filed the Motion without a Statement of Undisputed Facts in violation of Local Rule 56. Although the District Court noted that this "could be fatal" to the Motion, it exercised its "broad discretion" to relax the rules and "excuse noncompliance." [ECF Doc. No. 35 at p. 11.] Appellants also noted that Appellee did not file its evidentiary exhibits with its Motion, instead only filing the exhibits after the filing of Appellant's Reply Brief. [ECF Doc. No. 31 at p. 4, n.3; ECF Doc. No. 34-1.] The District Court merely noted that Appellants did not file a request for leave to submit a Sur-Reply and went on to rely improperly on those late-filed exhibits fourteen days later when granting Appellee summary judgment. [ECF Doc. No. 35 at p. 22, n.8.]

13

Appellants for not giving notice sooner was that they believed this was a workers' compensation issue. However, this position could be used as an admission in the Underlying Lawsuit that Ms. Harris was an "employee" and such an admission could have implications regarding Classic City's potential liability. [ECF Doc. No. 31-3 at ¶ 5.][4] This and other issues force Appellants into a dilemma of taking positions that might undermine the very defense Appellees are providing (under a reservation of rights) in order to secure that defense going forward.

Accordingly, because the District Court's sole basis for granting summary judgment involved consideration of matters outside the Underlying Complaint and Policy, Appellants respectfully request that this Court reverse the District Court's ruling.

## B.    The District Court Erred When It Held That Appellee Owed Mrs. Martin No Duty to Defend.

Even if the District Court was permitted to consider evidence beyond the underlying complaint and policy, that court still erred when it concluded as a matter of law that Appellee had no duty to defend Mrs. Martin in the Underlying Lawsuit. When briefing her opposition to the summary judgment motion, Mrs. Martin explained that she did not personally provide notice of the Incident to Appellee because: (1) she did not have a reasonable expectation that Ms. Harris would assert

---

[4] To be clear, Appellants are not conceding that Ms. Harris is an "employee." Indeed, Ms. Harris dropped her worker's compensation claim.

14

a claim against her for driving her to the hospital rather than waiting on an ambulance to arrive at the remote farm; (2) she believed Mr. Martin **had** provided notice to Appellants; and (3) the Martins believed, at worst, that this was a workers' compensation matter. [ECF Doc. No. 31 at pp. 9-13, 15-16.] The District Court erred in rejecting these arguments:

1. <u>A Jury Could Conclude that Mrs. Martin Did Not Have a Reasonable Expectation That She Would be Sued for Driving Ms. Harris to Receive Medical Attention and, Therefore, Need Not Notify Appellee.</u>

The Underlying Complaint relies upon two separate events as the basis for liability. The first event is the actual injury to Ms. Harris from the Gator Incident. The second event is Mrs. Martin driving Ms. Harris to the hospital instead of placing her in an ambulance. [ECF Doc. No. 1-1 at ¶¶ 34-35, 52-53.] This is an important distinction because Ms. Harris does not allege that Mrs. Martin was responsible at all for the Incident, only that her decision to drive Ms. Harris to the hospital rather than waiting on an ambulance caused additional injury. [*Id.*] The Policy requires that an insured provide notice "as soon as practicable" of an "occurrence" that "may result in a claim." [ECF Doc. No. 1-2 at p. 33.]

Mrs. Martin argued that the Incident and her decision to drive Ms. Harris to the hospital were separate "occurrences" under the Policy. [ECF Doc. No. 31 at p. 10.] Because Mrs. Martin was sued over a separate "occurrence" (as contemplated by the Policy), "[t]he only question from Mrs. Martin's perspective is whether she

15

should have notified [Appellant] of her decision to drive Ms. Harris to the hospital and whether a reasonable person would think that driving an injured person to the hospital was an event likely to give rise to a claim." [ECF Doc. No. 31 at p. 10.] The District Court **agreed** with Mrs. Martin that the decision to drive Ms. Harris to the hospital was a separate "occurrence" and that the only issue from Mrs. Martin's perspective was whether she should have notified Appellee of that decision. [ECF Doc. No. 35 at pp. 26-27.] Nonetheless, the District Court decided that, as a matter of law, Mrs. Martin should have notified Appellee of her decision to drive Ms. Harris to the hospital and that "any reasonable person in Mrs. Martin's shoes would have known that taking control of the situation, including preventing trained EMTs with an ambulance from providing professional and immediate aid and effectively delaying the treatment of Ms. Harris' serious injury, was likely to give rise to a claim under the Policy." [ECF Doc. No. 35 at p. 27.] This was error.

In cases in which an insurer alleges late notice as a basis for noncoverage, "[w]hether the excuse or justification was sufficient and whether the insured acted diligently in giving the notice are generally questions of fact, to be determined by the jury, according to the nature and circumstances of each individual case." *State Farm Fire & Cas. Co. v. Walnut Ave. Partners*, 675 S.E.2d 534, 538 (Ga. Ct. App. 2009). "There is no bright-line rule on how much delay is too much." *Vintage Hospitality Group, LLC v. Nat. Trust Ins. Co.*, 565 F. Supp. 3d 1365, 1369 (M.D.

Ga. 2021) ("the fact that [the insured] gave notice nineteen months after the event it now maintains gives rise to its claim is certainly not dispositive").

"Under Georgia law, an insured is not required to foresee every possible claim, no matter how remote, that might arise from an event and give notice of it to his insurer. Instead, the law only requires an insured to act reasonably under the circumstances." *BLB Const. Inc. v. Auto-Owners Ins. Co.*, 418 F. Supp. 3d 1325, 1331 (S.D. Ga. 2019) (internal quotations omitted). When evaluating an excuse for a delay in providing notice to an insurer, "a trial court must make every effort to eliminate the distorting effects of hindsight and to evaluate the conduct of the insured from the perspective of a reasonable person in the same circumstances as those in which the insured found himself." *Forshee v. Employer's Mut. Cas. Co.*, 711 S.E.2d 28, 32 (Ga. Ct. App. 2011).

The District Court's conclusion that every reasonable person in Mrs. Martin's position would have foreseen a claim against them for driving Ms. Harris to the hospital (and that no jury could find otherwise) is plain error. The Underlying Complaint states that Mrs. Martin knew about the event (i.e. Ms. Harris being hurt by the Gator's winch), but there is no allegation that she examined the severed fingers (or even knew the fingers were nearly severed at all). Instead, the Underlying

Complaint only alleges that Mrs. Martin told the medical staff that Ms. Harris "may have hurt her fingers[.]" [ECF Doc. No. 1-1 at ¶ 40.][5]

Moreover, Ms. Harris' fingers were reattached at the hospital and she was discharged. [ECF Doc. No. 1-1 at ¶ 44.] It was only later that Ms. Harris' doctor determined that the "reattached fingers were not thriving and, were beginning to necrotize instead, leading the treating surgeons to recommend that portions of the finger be completely amputated." [*Id.*] Crucially, there is no allegation anywhere in the Underlying Complaint that Mrs. Martin was told about the subsequent amputation. There were no facts before the District Court from which it could conclude that Mrs. Martin knew that her act of driving Ms. Harris to the hospital instead of waiting on an ambulance led to the partial amputation of her fingers prior to the filing of the Underlying Lawsuit. In fact, in order to reach its conclusion, the District Court had to assume (a) that any reasonable Good Samaritan would believe that she would be sued for responding in what she perceived to be in the best interests of the patient; (b) that she would assume this without knowing the full extent of the injuries to the patient; and (c) that a jury could not possibly conclude otherwise.

---

[5] The Underlying Complaint tries to characterize Mrs. Martin's actions as "downplaying" and otherwise frame the event as Mrs. Martin acting callously. [ECF Doc. No. 1-1 at ¶ 40.] However, Mrs. Martin's alleged statements and actions are also consistent with the possibility that Mrs. Martin did not understand the extent of the injury.

The District Court did exactly what the Georgia Court of Appeals cautioned trial courts **not to do**. The District Court used the distorting effects of hindsight and assumed that Mrs. Martin had knowledge of the amputation, knowledge that her actions may have caused that amputation, and that she unreasonably chose not to report this to the Appellee. For example, the District Court concluded that "Mrs. Martin should have immediately known that her actions were likely to give rise to a claim under the Policy, especially once she learned that Ms. Harris lost parts of two fingers." [ECF Doc. No. 35 at p. 28.] As set forth above, there is nothing in the Underlying Complaint to suggest that Mrs. Martin knew of the amputation prior to the filing of the Underlying Lawsuit.

In yet another example, the District Court tried to look beyond the allegations in the Underlying Complaint to infer that Mrs. Martin had full knowledge of the extent of Ms. Harris' injuries. [ECF Doc. No. 35 at p. 28.] The District Court's opinion states that "Mrs. Martin told Ms. Harris that 'she would be driving her to an urgent care center,' which suggests that she knew the injury was severe enough to require professional attention." [*Id.*] Maybe. However, it was also dark at the scene and Mrs. Martin was not there at the time of the injury. [ECF Doc. No. 1-1 at ¶¶ 21, 34, noting that the accident occurred "late evening of October 19, 2021," that Ms. Harris was injured as "[i]t was getting dark and nighttime was fast approaching," and Mrs. Martin arrived only later.] Further, unlike emergency rooms, urgent care

19

facilities treat everything from common colds to more serious injuries. That Mrs. Martin believed that an urgent care facility could treat the injury and that hospitalization was unnecessary also supports the notion that Mrs. Martin did not fully appreciate the extent of Ms. Harris's injury. Moreover, an injury needing medical attention does not necessarily mean an injury that will substantially worsen through any amount of delay in medical treatment. Merely taking someone to get medical attention is also insufficient to prove, as a matter of law, that every reasonable person in Mrs. Martin's position would have expected to be sued personally for driving Ms. Harris to an urgent care facility. On the contrary, Mrs. Martin's decision not to wait for the ambulance (despite Ms. Harris' alleged offer to pay for it) and Mrs. Martin's statement to hospital staff that Ms. Harris "may have hurt her fingers" all suggest that Mrs. Martin was **not** aware of the extent of the injuries. [ECF Doc. No. 1-1 at ¶¶ 35, 40.]

The District Court also focused on strange details in reaching its conclusion. When trying to analogize the facts of the case to those in another case, the District Court noted that "[Appellee] was not notified before Ms. Harris underwent surgery for her injury." [ECF Doc. No. 35 at p. 31.] However, the Underlying Complaint states that the initial surgery to reattach Ms. Harris' fingers happened the night of the injury, before Appellant possibly could have provided notice to Appellee. [ECF Doc. No. 1-1 at ¶ 43.] The subsequent recommendation for the reattached fingers to

be partially amputated then came "a couple of days" later. [*Id.* at ¶ 44.] It is not clear what the District Court believes Appellee would have done in the few days between the Incident and amputation recommendation had it had notice from Mrs. Martin.

The issue before the District Court (and this Court) is not whether Mrs. Martin was ultimately negligent or whether Appellee has a duty to indemnify her. The only issue is whether, taking all of the allegations and above-cited law together, a jury could conclude that Mrs. Martin had a reasonable basis for not notifying Appellee of her decision to drive Ms. Harris to the hospital instead of placing her in an ambulance. Because it cannot be said that no reasonable person would have failed to notify Appellee of the decision to drive Ms. Harris to the hospital in these circumstances, a jury issue exists and this Court should reverse the District Court's grant of summary judgment.

2.  Ms. Martin Believed that Notice Had Been Provided to Appellee.

The District Court next erred in concluding that Mrs. Martin did not have a reasonable excuse for not providing notice when she stated that she had believed that Mr. Martin had already notified Appellee of the Incident. [ECF Doc. No. 35 at pp. 31-32.] Mrs. Martin explained in a declaration that, on October 20, 2021, Mr. Martin (Mrs. Martin's husband) told her that "he had called to let [their] insurance know about an incident involving" Ms. Harris. [ECF Doc. No. 31-2 at ¶ 2.] Mrs. Martin

21

"interpreted that statement to mean that [Mr. Martin] had reported the incident to [their] insurance carrier[.]"[6] [*Id.*]

The District Court seems to have misunderstood the point of this argument. In its opinion, the District Court spent three paragraphs explaining why Mr. Martin's notice was ultimately ineffective. [ECF Doc. No. 35 at pp. 31-33.] The District Court explained that Mr. Martin leaving a message with his insurance agent was insufficient in the absence of an actual or apparent agency relationship and that Mrs. Martin could not rely on his representation that he had made the notification. [ECF Doc. No. 35 at p. 32.]

However, this misses the point of Mrs. Martin's declaration. From Mrs. Martin's perspective, her husband, the insured under the Policy, timely provided notice of the Incident. Therefore, there was no reason for her to notify Appellee again. Even if the District Court was correct that the notification provided by Mr. Martin was insufficient, there was no information before the District Court to show

---

[6] This position is not mutually exclusive with Mrs. Martin's reasonable belief that no notice was necessary. Mrs. Martin may have believed that it was overkill to provide notification of an incident not likely to lead to liability. Or she may have believed that, while Classic City Clydesdale's may have potentially been liable for the accident, she was not possibly liable for driving Ms. Harris to the hospital. In fact, the positions may actually support one another. That Mrs. Martin was not concerned about being held liable may have led her not to follow up to make sure Appellee actually received the notice that her husband told her he provided. Regardless, all of this highlights why Mrs. Martin's explanation of the timing of her notice should go to a jury and not be weighed as reasonable or not by the District Court.

22

that Mrs. Martin knew that. The purpose of including these details was not to show that Mr. Martin's notice to Appellee was effective; it was to explain why it was reasonable for Mrs. Martin not to have independently notified Appellee of her involvement driving Ms. Harris to the hospital. Because a jury could reasonably conclude that Mrs. Martin believed that Appellee already had notice, there is a jury issue as to whether she acted reasonably. Accordingly, the District Court's grant of summary judgment should be reversed.

3. <u>Appellants Were Justified in Believing that the Incident was, at Worst, a Worker's Compensation Matter.</u>

The District Court next erred when distinguishing the facts of this case from those of *Newberry v. Cotton States Mutual Insurance Company*. [ECF Doc. No. 35 at p. 29.] Mrs. Martin relied on *Newberry* in her summary judgment response because it was a case with very similar facts.

In *Newberry*, the Georgia Court of Appeals held that late notice to an insurer of a fight at a party was excused where an insured believed that the incident would be covered by workers' compensation. *Newberry v. Cotton States Mut. Ins. Co.*, 531 S.E.2d 362, 363-64 (Ga. Ct. App. 2000). In deciding that a jury issue existed as to whether the delay was reasonable, the Court of Appeals explained:

> However, there is evidence that the Newberrys had actual knowledge that the plaintiff in the underlying lawsuit had filed a workers' compensation claim based on this incident and that she filed suit only after that claim was denied. Newberry stated that he believed that if a claim was filed,

23

> it would be handled through workers' compensation. Newberry was not required to foresee every possible claim, no matter how remote, that could have arisen from the incident. [Citations.] He was required only to act reasonably under the circumstances.

[*Id.*] In *Newberry*, the insured did not provide immediate notice to the insurer because he believed that the claim would be handled by workers' compensation, the incident occurred at an out-of-state work holiday party, and he did not believe his homeowners' insurance would cover the claim. *Id.* at 363-64.

In other words, in *Newberry*, the delay may be excused by a jury because: (1) the insured believed it could be a workers' compensation issue; and (2) he did not believe that his insurance policy would provide coverage. *Id.* at 363-64; *see also Standard Guar. Ins. Co. v. Carswell*, 384 S.E.2d 213, 215 (Ga. Ct. App. 1989) ("the fact that an insured did not know the policy might afford coverage under a given factual situation may provide justification for the failure to give notice" and "[w]here there is a conflict in the evidence on the issue of insured's lack of knowledge of coverage, a jury must determine the question").

The same is true in this case. As set forth in Mr. Martin's declaration, he "understood that any claim [Ms. Harris] had would be resolved through workers' compensation." [ECF Doc. No. 31-3 at ¶ 5.] There is evidence that Mr. and Mrs. Martin knew that Ms. Harris had filed a workers compensation action. [ECF Doc. No. 31-3 at ¶ 5.] The Policy in this case had a specific endorsement that excluded

24

coverage for "bodily injury" to any employee eligible to receive any benefits that an insured voluntarily provided or is required to provide under any workers' compensation . . . law." [ECF Doc. No. 1-2 at p. 7.] Appellants therefore believed, like in *Newberry*, that: (1) the Incident was a workers' compensation issue; and (2) it was not covered by the Policy.

The District Court tried to distinguish the facts in *Newberry* from those in this case on the basis that *Newberry* involved a homeowners' insurance policy, the incident that gave rise to the claim was an intentional tort that happened out-of-state from the insured's home, and the insured "had no idea that his homeowner's insurance policy might afford coverage for an intentional tort that occurred at an office Christmas party hundreds of miles from his house." [ECF Doc. No. 35 at pp. 29-30 (quoting *Newberry*).] But these are distinctions without difference. While the facts in this case are nominally different than those in *Newberry* (no Christmas party, no intentional tort, and not out-of-state), the underlying principles are the same— there was a (mistaken) belief that workers' compensation would handle the claim and the relevant insurance policy would not provide coverage.

Accordingly, *Newberry* is on point and this Court should reverse the District Court's grant of summary judgment so that a jury may decide whether any delay in providing notice was reasonable.

**C.    Even if Notice was Late, Appellee was Required to Show Prejudice to be Excused of any Duties Under the Policy.**

25

Mrs. Martin explained in her response to the Motion that the Policy requires notice of an "occurrence" to Appellee, but it does not state that the notice is a condition precedent to coverage. [ECF Doc. No. 31 at p. 14.] "[W]here a notice provision is not expressly made a condition precedent to coverage of the insurance contract, an insured's failure to comply with the notice provision will result in a forfeiture of coverage only if the insurer demonstrates that it was prejudiced by the insured's failure." *Plantation Pipe Line Co. Stonewall Ins. Co.*, 780 S.E.2d 501, 510 (Ga. Ct. App. 2015) (emphasis added).

To argue that timely notice was a condition precedent to any duties under the Policy, Appellee and the District Court relied on a provision in the Policy that states:

### 4.    LEGAL ACTION AGAINST US

No person or organization has a right under this Coverage Form:

**a.** To join us as a party or otherwise bring us into a "suit" asking for damages from an "insured"; or
**b.** To sue us on this Coverage Form unless all of its terms have been fully complied with.

[ECF Doc. No. 1-2 at p. 33.] Appellants explained in their opposition to the Motion that this provision only applies when someone seeks to join Appellee as a party or sue it on the Policy. [ECF Doc. No. 31 at pp. 14-15.] Appellee is not a party to the Underlying Lawsuit and no one has sued it or sought to join it in any lawsuit. Instead,

26

Appellee has preemptively sued Appellants for a declaratory judgment that it has no duties under the Policy. [ECF Doc. No. 1.]

Appellee argued—and the District Court agreed—that the language in the LEGAL ACTION AGAINST US provision quoted above created a condition precedent to Appellee's duty to defend under the Policy even without anyone suing Appellee or otherwise asserting claims and joining it to a lawsuit. [ECF Doc. No. 33 at p. 3; ECF Doc. No. 35 at p. 21.] Appellee and the District Court both relied on the case of *Progressive Mountain Insurance Company v. Bishop*, 790 S.E.2d 91 (Ga. Ct. App. 2016), to support their position. [*Id.*]

Appellee and the District Court have misread *Bishop*. A close reading of the *Bishop* opinion suggests that someone **did** bring the insurer into the case and assert claims against it.[7]  The assertion of claims against the insurer and/or bringing it into

---

[7] The exact posture of the parties in *Bishop* is hard to discern from the pleadings and, indeed, was hard for the Georgia Court of Appeals to discern. However, the opinion states that the insurer filed an answer in its own name, sought dismissal of the claims against it, and asserted a cross-claim. *Progressive Mountain Ins. Co. v. Bishop*, 790 S.E.2d 91, 93-94 (Ga. Ct. App. 2016) ("Progressive filed an answer in its own name, seeking dismissal of any claims against it and making a cross-claim against the defendant"). The opinion also explains in a footnote that "Although [plaintiff's] complaint is not included in the record, on appeal, it does not appear that [plaintiff] sued [the insurer] directly." *Id.* at n.1. Regardless, the fact that the insurer filed an answer and sought to dismiss the claims against it suggests that someone (probably the insured) brought it into the case and asserted claims against it. Accordingly, the insurer in *Bishop* still would have been "joined" or "brought into" the suit, triggering the condition precedent policy provision.

27

the suit would have obviously triggered the LEGAL ACTION AGAINST US provision. *Bishop* was not a situation where the insurer initiated its own declaratory judgment action in the absence of anyone joining it to a lawsuit or otherwise bringing claims against it. *Bishop*, 790 S.E.2d at 116-17.

The other case cited by Appellee was *Lankford v. State Farm Mut. Auto Ins. Co.*, 703 S.E.2d 436 (Ga. Ct. App. 2010). Here again, a careful reading of the opinion reveals that the insurer "was served with the complaint on September 8, 2008, and six months later, the insurer moved for summary judgment, asserting that it had not received timely notice[.]" *Lankford*, 703 S.E.2d at 1438. This was yet another instance of the insurer either being sued or otherwise brought into a lawsuit,[8] which would no doubt trigger the language of policy provisions like that found in the LEGAL ACTION AGAINST US provision of Appellants' Policy. At least one other appellate decision using this reasoning also appear to involve situations where the insurer was sued or otherwise joined to an action. *See, e.g., Hyde v. State Farm Mut. Automobile Ins. Co.*, 848 S.E.2d 145, 147 (Ga. Ct. App. 2020) (noting that the plaintiff "served State Farm, as an uninsured motorist carrier, with the complaint and summons").[9]

---

[8] Although not formally part of the opinion, the Westlaw Synopsis Background section describes the action as "Insured brought action against insurer seeking uninsured motorist (UM) coverage arising out of an automobile accident."

[9] Appellants have found another case, *Barclay v. Stephenson*, 787 S.E.2d 322 (Ga. Ct. App. 2016), with a complicated procedural history that involved what looks to

28

No one has sued Appellee. No one has even sought to join Appellee or otherwise bring it into any action. The LEGAL ACTION AGAINST US provision has not been triggered.

In the absence of triggering a condition precedent, Appellee must demonstrate that any delay in providing notice prejudiced it. *See Plantation Pipe Line*, 780 S.E.2d at 510. Appellee has not even tried to present any such evidence, nor can it. Accordingly, without evidence of prejudice, Appellee cannot obtain summary judgment that it has no duty to defend Appellants in the Underlying Lawsuit.

**D.    Classic City is Covered by the Policy.**

---

be four consolidated appeals. The vague procedural history recited makes it unclear whether the insurer was joined to any lawsuit or directly sued, but it does state that the insurer filed a declaratory judgment action as to coverage. *Barclay*, 787 S.E.2d at 324. The court concluded that timely notice was a condition precedent for the insurer's duties under the policy. *Id.* at 329. *Bishop* appears to be the only appellate decision that cites to *Barclay* for the proposition that timely notice becomes a condition precedent when coupled with a provision requiring compliance with all policy provisions. Appellants have found another ambiguous case suggesting that notice is a condition precedent when coupled with a provision about full compliance with policy terms prior to bringing suit against the insurer. *See Bramley v. Nationwide Affinity Ins. Co. of America*, 814 S.E.2d 770 (Ga. Ct. App. 2018). *Bramley* also has an unclear procedural history that does not expressly state that the insurer was sued or otherwise brought into an action, but it does reference the insurer's filing a motion and notes that the counsel for the other driver in the underlying car accident was seated at the table with the insurer and allowed to speak at the motion hearing. *Bramley*, 814 S.E.2d at 772. These facts suggest that the insurer was joined or otherwise involved in the underlying case between the two drivers, but the opinion does not otherwise explicitly say that the insurer was sued or joined. Regardless, *Bramley* is physical precedent only and not binding on this Court. Ga. App. Ct. R. 33.2(a)(3).

29

Finally, the District Court erred when concluding that Classic City was not covered under the Policy. [ECF Doc. No. 35 at pp. 13-20.] Appellee, when moving for summary judgment, cited to the Policy's default definition of "Insured," and failed to account for the fact that the Policy included the Endorsement that eliminated that definition. [ECF Doc. No. 29 at pp. 14-15; ECF Doc. No. 31 at pp. 17-19; ECF Doc. No. 1-2 at pp. 7-8.] The defunct definition of "Insured" cited by Appellee stated (otherwise known as "Definition 8"):

> 8.    **"Insured"**
>
>     a. "Insured" means you, and if you are:
>        (1) An individual, "insured" also means the following members of your household;
>          (a.)    Your relatives.

[ECF Doc. No. 1-2 at p. 35.] However, pursuant to the Endorsement, Definition 8 "does not apply to the insurance afforded under this endorsement" and was replaced by new language that read, in relevant part:

> **SECTION II – WHO IS AN INSURED**
>
> 1. If this endorsement is made a part of a policy containing the Farm Liability Coverage Form Definition 8. (Section IV) of that Coverage Form does not apply to the insurance afforded under this endorsement.
>
> . . .
>
> 3. With respect to the insurance afforded under this endorsement, the following applies:

    a. An individual, you are an insured, and, if they are members of your household, your spouse, and your spouse's relatives who are under the age of 21 are also insureds;

    b. A partnership or joint venture, you are insured. Your members and partners, and their spouses are also insureds, but only with respect to the conduct of your "farming" operations.

    c. An organization other than a partnership or joint venture, you are an insured. Your executive officers, directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

[ECF Doc. No. 1-2 at pp. 7-8.] Mr. Martin stated in his declaration that the Endorsement language quoted above caused him to believe that he, Mrs. Martin, and Classic City all had insurance coverage. [ECF Doc. No. 31-3 at ¶ 2.]

The differences between the language in Definition 8 and the Endorsement reinforce their belief. Definition 8 was clear that "Insured" meant "you," and the Policy elsewhere defined "you" as the "Named Insured shown in the Declarations." [ECF Doc. No. 1-2 at p. 25.] However, the Endorsement replaced Definition 8, eliminated the language of "'Insured' means you" and instead just listed three separate insured categories. [ECF Doc. No. 1-2 at p. 7-8.] One of those categories was "[a]n organization other than a partnership or joint venture[.]" [*Id.*] Mr. Martin reasonably interpreted this new provision to mean that insurance coverage was extended to his entity, Classic City. [ECF Doc. No. 31-3 at ¶ 2.]

31

"In construing an insurance contract[,] the test is not what the insurer intends its words to mean, but rather what a reasonable person in the insured's position would understand them to mean. Where such a provision is susceptible to two or more interpretations, the courts will construe it most favorably to the insured." *Gulf Ins. Co. v. Mathis*, 182 Ga. App. 323, 324 (1987). Courts should read the policy "as a layman would read it[.]" *Nat'l Cas. Co. v. Ga. Sch. Bds. Ass'n-Risk Mgmt. Fund*, 818 S.E.2d 250, 253 (Ga. 2018). "[I]t is the understanding of the average policyholder which is to be accepted as a court's guide to the meaning of words, with the help of the established rule that ambiguities and uncertainties are to be resolved against the insurance company." *Fid. Nat'l Title Ins. Co. v. Keyingham, Inv., LLC*, 702 S.E.2d 851, 853 (Ga. 2010).

The District Court stated that the Endorsement "reflects no intent whatsoever to cover Classic City." [ECF Doc. No. 35 at p. 14.] Although the District Court declared that the Endorsement was "not ambiguous," it spent several pages working through the Endorsement's language, citing to *The Chicago Manual of Style* and *The Redbook: A Manual on Legal Style*. [*Id.* at p. 17.] In the Court's own words:

> The introductory phrases do not define "you"; instead they function conditionally by identifying the category of named insured to which the main clause applies. In other words, the main clause—"you are insured . . . "—is only valid if the named insured matches the legal entity—*e.g.,* individual joint venture, etc.—identified by the introductory appositive phrase. [Citations] This is clear for two reasons. First, as already explained, the Policy

32

explicitly states that "[t]hroughout [the Policy] the words 'you' and 'your' refer to the Named Insured shown in the Declarations," and the Declarations identify the named insured as Mark Martin. [Citations.] Second, each phrase must be read as nonrestrictive because it "is set off from its referent" (here, "you") by a comma. [Citation]. As a nonrestrictive appositive, each phrase "merely provides additional information about its referent without exclusively identifying it," and this does not overcome the presumption that "you" means what the Policy says it mean—Mark Martin as an individual. *See Garner, Redbook* § 11.7(a). Since these introductory phrases do not redefine "you," and because "you" can only align and agree with one of these introductory phrases at a time, these introductory phrases function conditionally, specifying the category of named insured to which the section applies.

[ECF Doc. No. 35 at pp. 17-18.]

The District Court's conclusion is problematic for a couple of reasons. First, Appellants submit to this Court that, as soon as the District Court must turn to *The Redbook: A Manual on Legal Style* and otherwise analyze contractual presumptions in light of nonrestrictive appositive phrases, it is no longer reading the Policy "as a layman would read it[.]" Second, the appropriate conclusion is not what the Endorsement might mean after applying legal canons of construction, but instead whether the average policyholder could believe that the Endorsement provides coverage for both Mr. Martin and his entity, Classic City. Because the average policyholder not only could arrive at that conclusion but very likely would, this

33

Court should resolve the issue in favor of Appellants and find that there is coverage for Classic City.

## **CONCLUSION**

For all of the foregoing reasons, Appellants respectfully request that this Court reverse the District Court's entry of summary judgment.

Respectfully submitted on January 2, 2025.

*/s/ Jonathan Palmer*
Jonathan M. Palmer
Georgia Bar No. 453452

**KNIGHT PALMER, LLC**
One Midtown Plaza
1360 Peachtree Street, N.E. Suite 1201
Atlanta, Georgia 30309
Tel: (404) 228-4822
Fax: (404) 228-4821
jpalmer@knightpalmerlaw.com

## CERTIFICATE OF COMPLIANCE

I submit this certification pursuant to Fed. R. App. P. 32(g). This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding parts of the document exempted by Fed. R. App. P. 32(f), this document contains 8,573 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font and the style of Times New Roman.

Submitted on January 2, 2025.

*/s/ Jonathan Palmer*
Jonathan M. Palmer
Georgia Bar No. 453452

**KNIGHT PALMER, LLC**
One Midtown Plaza
1360 Peachtree Street, N.E. Suite 1201
Atlanta, Georgia 30309
Tel: (404) 228-4822
Fax: (404) 228-4821
jpalmer@knightpalmerlaw.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this day served the foregoing OPENING BRIEF

OF DEFENDANT-APPELLANTS through this Court's electronic filing system to:

Frank C. Bedinger, Esq.
**HAWKINS PARNELL & YOUNG, LLP**
303 Peachtree St., NE
Suite 4000
Atlanta, Georgia 30308
fbedinger@hpylaw.com


Submitted on January 2, 2025.


*/s/ Jonathan Palmer*
Jonathan M. Palmer
Georgia Bar No. 453452

**KNIGHT PALMER, LLC**
One Midtown Plaza
1360 Peachtree Street, N.E. Suite 1201
Atlanta, Georgia 30309
Tel: (404) 228-4822
Fax: (404) 228-4821
jpalmer@knightpalmerlaw.com